UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PAUL V. McLELLAND,                    )   Case No. EDCV 09-1360 JC
                        Plaintiff,    )
                                      )   MEMORANDUM OPINION
            v.                        )
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social                )
Security,                             )
                        Defendant.    )
_____

## I.   SUMMARY

On July 24, 2009, plaintiff Paul V. McLelland ("plaintiff") filed a
Complaint seeking review of the Commissioner of Social Security's denial of
plaintiff's applications for benefits.  The parties have filed a consent to proceed
before a United States Magistrate Judge.

This matter is before the Court on the parties' cross motions for summary
judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion").  The
Court has taken both motions under submission without oral argument.  See Fed.
R. Civ. P. 78; L.R. 7-15; July 30, 2009 Case Management Order ¶ 5.

///

1    Based on the record as a whole and the applicable law, the decision of the

2    Commissioner is AFFIRMED.  The findings of the Administrative Law Judge

3    ("ALJ") are supported by substantial evidence and are free from material error.[1]

4  **II.    BACKGROUND AND SUMMARY OF ADMINISTRATIVE**

5  **DECISION**

6    On September 29, 2006, plaintiff filed an application for Social Security

7    Income benefits.  (Administrative Record ("AR") 102, 108).  Plaintiff asserted that

8    he became disabled on September 9, 2006, due to a seizure disorder and heart

9    problems.  (AR 102-04).  The ALJ examined the medical record and heard

10   testimony from plaintiff, who was represented by counsel, and a vocational expert

11   on December 11, 2008.  (AR 21-43).

12   On February 2, 2009, the ALJ determined that plaintiff was not disabled

13   through the date of the decision.  (AR 8-15).  Specifically, the ALJ found:

14   (1) plaintiff suffered from the following severe impairments:  seizure disorder,

15   obesity, cervical degenerative disc disease, lumbar strain, history of cardiac

16   catheterization and muscle imbalance of the left eye (AR 10); (2) plaintiff did not

17   have an impairment or combination of impairments that met or medically equaled

18   one of the listed impairments (AR 10-11); (3) plaintiff could perform light work

19   with some limitations[2] (AR 11-13); (4) plaintiff could not perform his past

20

21   _____

22    [1]The harmless error rule applies to the review of administrative decisions regarding
      disability.  See Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1196

23    (9th Cir. 2004) (applying harmless error standard); see also Stout v. Commissioner, Social
      Security Administration, 454 F.3d 1050, 1054-56 (9th Cir. 2006) (discussing contours of

24    application of harmless error standard in social security cases).

25    [2]The ALJ determined that plaintiff had the residual functional capacity to perform light

26    work except:  (i) he could perform postural activities and overhead reaching only occasionally
      (from very little up to one-third of the time, or approximately 2 hours in an 8-hour day);

27    (ii) he had reduced depth perception due to decreased left eye motility; and (iii) he should avoid
      even moderate exposure to hazards, such as working at heights, or being around machinery or

28    water, and was precluded from driving.  (RT 11).

1  relevant work (AR 13); (5) there are jobs that exist in significant numbers in the
2  national economy that plaintiff could perform (AR 14); and (6) plaintiff's
3  allegations regarding his limitations were not totally credible (AR 12).

4  On May 21, 2009, the Appeals Council denied plaintiff's application for
5  review.  (AR 1-3).

6  **III.   APPLICABLE LEGAL STANDARDS**

7  **A.   Sequential Evaluation Process**

8  To qualify for disability benefits, a claimant must show that he is unable to
9  engage in any substantial gainful activity by reason of a medically determinable
10 physical or mental impairment which can be expected to result in death or which
11 has lasted or can be expected to last for a continuous period of at least twelve
12 months.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing 42 U.S.C.
13 § 423(d)(1)(A)).  The impairment must render the claimant incapable of
14 performing the work he previously performed and incapable of performing any
15 other substantial gainful employment that exists in the national economy.  Tackett
16 v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

17 In assessing whether a claimant is disabled, an ALJ is to follow a five-step
18 sequential evaluation process:

19      (1)   Is the claimant presently engaged in substantial gainful activity?  If
20            so, the claimant is not disabled.  If not, proceed to step two.

21      (2)   Is the claimant's alleged impairment sufficiently severe to limit
22            his ability to work?  If not, the claimant is not disabled.  If so,
23            proceed to step three.

24      (3)   Does the claimant's impairment, or combination of
25            impairments, meet or equal an impairment listed in 20 C.F.R.
26            Part 404, Subpart P, Appendix 1?  If so, the claimant is
27            disabled.  If not, proceed to step four.

28 ///

3

(4)     Does the claimant possess the residual functional capacity to perform his past relevant work?[3]  If so, the claimant is not disabled.  If not, proceed to step five.

(5)     Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow him to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); see also Burch, 400 F.3d at 679 (claimant carries initial burden of proving disability).

**B.     Standard of Review**

Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error.  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1457 (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more than a mere scintilla but less than a preponderance.  Robbins, 466 F.3d at 882 (citing Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990)).

---

[3]Residual functional capacity is "what [one] can still do despite [ones] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

1    To determine whether substantial evidence supports a finding, a court must

2 "'consider the record as a whole, weighing both evidence that supports and

3 evidence that detracts from the [Commissioner's] conclusion.'"  <u>Aukland v.</u>

4 <u>Massanari</u>, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting <u>Penny v. Sullivan</u>, 2 F.3d

5 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming

6 or reversing the ALJ's conclusion, a court may not substitute its judgment for that

7 of the ALJ.  <u>Robbins</u>, 466 F.3d at 882 (citing <u>Flaten</u>, 44 F.3d at 1457).

8 **IV.   FACTS**

9     **A.   Plaintiff's Statements/Testimony**

10     In a disability report dated September 29, 2006, plaintiff stated:  He suffered

11 from epilepsy and heart problems.  (AR 108).  He could stand for no longer than 2

12 hours.  (AR 108).  He could not work over 5 hours daily due to pain in his foot and

13 back.  (AR 108).  He could not drive due to his medical condition.  (AR 108).  He

14 had been prescribed medication for his heart (with a side effect of nausea) and

15 anti-seizure medication (with side effects of dizziness, nausea and fatigue).  (AR

16 116).  He was in total need of help, without proper medicines, unable to continue

17 working, and unable to pay his bills.[4]  (AR 116).

18     In a seizure questionnaire dated November 9, 2006, plaintiff stated:  He had

19 seizures 12 or more times a month.  (AR 118).  He had had 4 seizures between

20 October 21, 2006 and November 6, 2006.  (AR 118).  His seizures usually lasted

21 10 to 20 minutes.  (AR 118).  It took him at least 24 hours after a seizure to resume

22 normal activities.  (AR 118).  He did not always take his medications and would

23 run out because he had no means of affording medical care or transportation.  (AR

24 119).  The medications cut down but did not eliminate his seizures.   (AR 119).

25 He did not then have a doctor.  (AR 119).

26 ///

27

28     [4]In the same function report, petitioner's roommate, Deneil Popkoff (Otto), described petitioner's seizures and heart problems.  (AR 116-17).

In a November 9, 2006 exertional daily activities questionnaire, plaintiff stated:  Without his medication, he had had multiple seizures and could not go anywhere.  (AR 151).  His back had given out and he could not pick up large or heavy items.  (AR 151).  He could not lift more than 10 or 15 pounds without back, neck, leg and head pain.  (AR 152).  When he did too much work indoors, his back, legs and neck caused him an extreme amount of pain to the point that he had headaches and could not sleep very long.  (AR 151).  Most of the time, his chest, stomach and back hurt so much that he could not eat.  (AR 151).  His seizures had caused him to lose his eyesight.  (AR 151).  He could not walk for more than 10 or 15 minutes at a time or his back, legs and head would hurt.  (AR 151).  Sitting even hurt.  (AR 151).  He could not carry more than 15 pounds.  (AR 152).  He used to do his own grocery shopping but could not do so anymore due to lack of transportation.  (AR 152).  He did yard work for only very few minutes at a time due to back, neck, leg and head pain.  (AR 152).  He took anti-seizure, heart, stomach, and blood pressure medication.  (AR 153).

In a February 2007 disability report, plaintiff stated:  Beginning in January 2007, the frequency of plaintiff's seizures increased, though their duration had decreased to between 5 to 10 minutes.  (AR 126).  He was mentally stressed because he could not pay his bills, no one wanted to hire someone with seizures, and he could not see a doctor without insurance.  (AR 126, 128).

In a function report dated March 2, 2007, plaintiff stated:  He lived with a girlfriend/roommate in a mobile home park.  (AR 94).  He slept and watched television most of the day.  (AR 94).  He took care of a pet.  (AR 95).  He prepared his own meals on a daily basis.  (AR 96).  He was able to wash dishes and to pick up dog waste on a daily basis, and to do laundry every two weeks.  (AR 96).  He went outside only when needed and either walked or used public transportation.  (AR 97).  He shopped in stores for food.  (AR 97).  He did not need anyone to accompany him to medical appointments.  (AR 98).  His condition affected his

1  ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, see, remember,
2  concentrate, understand, follow instructions and get along with others.  (AR 99).
3  His condition did not affect his ability to sit, talk, hear, complete tasks, or use his
4  hands.  (AR 99).  He was unable to lift large weights due to his back injury and
5  seizures.  (AR 99).  He could walk no more than a mile, if that, and had to rest at
6  least 15 to 20 minutes before walking.  (AR 99).

7        In a post-April 26, 2007 disability report, plaintiff stated:  His condition had
8  worsened in that he could not stand for more than 10 minutes at one time.  (AR
9  144).  His back could not stop hurting long enough for him to do anything.  (AR
10 144).  He was then taking aspirin (as a blood thinner) and other medications for
11 high blood pressure, chest pain (with a side effect of headaches) and seizures.
12 (AR 146).  His seizures caused confusion and disorientation.  (AR 148).  Although
13 he had tried to get jobs, no one would hire him because he was a high risk of
14 causing a fire or hurting himself.  (AR 148).  He was depressed and did not want
15 to leave his home because he had had seizures on the bus, would wet himself, and
16 would be taken to the hospital where he did not know where or who he was.  (AR
17 148).  He did not know what to do because the doctors he needed to see did not
18 work for free or insurance and would not see him.  (AR 148).  The stress caused
19 him to have chest pains.  (AR 148).

20       At the December 11, 2008 hearing, plaintiff testified:  His back and
21 shoulders were then hurting.  (AR 24-25).  He had numbness in his foot.  (AR 25).
22 He did not drive because he had epilepsy.  (AR 30).  The epilepsy had become a
23 lot worse the past two years.  (AR 30).  He was on anti-seizure medication.  (AR
24 31).  He usually obtained food and other items from Set Free Ministries which
25 transported him.  (AR 31).  He watched TV at home until his vision became blurry
26 or he got a headache.  (AR 32).  The manager tended his yard.  (AR 32).  He had
27 no social life, did not date, and was not in touch with any family members.  (AR
28 32).  He would experience pain in his back within five minutes of getting up on his

1   feet. (AR 33). His right foot would get numb which would cause him trouble

2   walking. (AR 33). He had been told by someone at the Desert Valley Hospital

3   that his back pain was the result of whiplash he suffered when he had a seizure

4   and fractured his neck. (AR 34). In certain circumstances, he experienced

5   dizziness, numbness, and soreness connected to his neck pain. (AR 36). His left

6   eye had always been a problem. (AR 36). His left eye had been surgically opened

7   when he was a child because there was no muscle in it. (AR 36). Both eyes had

8   worsened in that he experienced more vision problems, blurriness, and lack of

9   clarity. (AR 37). His eye problems made reading difficult as he would get

10  headaches after two to five minutes of reading. (AR 37). He slept in a recliner

11  because he could not get out of bed due to his back problem. (AR 37-38). He also

12  spent two to three hours in the recliner between breakfast and lunch and

13  approximately two hours in the recliner before taking his evening medicine. (AR

14  37). He continued to suffer from seizures, though not as drastically as in the past.

15  (AR 38). He had recorded having up to 16 seizures in a month, but the number

16  had gone down to between 13 and 15 – sometimes heavy, sometimes light. (AR

17  38-39). He easily had two to three seizures a week. (AR 39). He did not go to the

18  doctor more frequently or go to the hospital when he suffered from the seizures

19  because of transportation problems. He did not know anyone who could get him

20  there and an ambulance to the emergency room cost over $1000. (AR 39-40). He

21  was then "medically bankrupt." (AR 40). The last time he had gone to the

22  hospital for a seizure, they had not done anything other than look him over,

23  confirm he had had a seizure, and taken blood to test. (AR 40). He also continued

24  to suffer from chest pain, and most recently had suffered from chest pain the prior

25  day. (AR 40). He had suffered from chest pain twice in the last month and once

26  in the month before that. (AR 41). He carried medication (nitro and dilantin) for

27  that at all times. (AR 40). Taking the medication left him with an "excruciating

28  headache." (AR 41).

**B.     Treatment Records**

The record contains treatment records for plaintiff from the Arrowhead Regional Medical Center ("ARMC"), High Desert Community Care, and Desert Valley Hospital which are summarized below.

On January 25, 2004, plaintiff visited the ARMC complaining of chest pain. (AR 227).  A chest x-ray showed a vague density in his left hilum which the radiologist noted was probably an artifact from a rib.  (AR 230).  However, the radiologist could not rule out that density was a mass lesion.  (ART 230).  A spiral cat scan of plaintiff's chest revealed no evidence of a pulmonary embolism, no mass lesion, and a small hiatal hernia.  (AR 229).  Plaintiff was assessed with atypical chest pain, with a note to rule out myocardial infarction.  (AR 227-28).  He was started on aspirin and nitroglycerin and scheduled for multiple tests including an electrocardiogram.  (AR 228).  He underwent a left heart catheterization and coronary angiogram.  (AR 232).  It was the doctor's impression that plaintiff had a totally occluded mild obtuse marginal branch with a high degree of stenosis of the small mild right coronary artery.  (AR 233).  The doctor also noted a disease of moderate severity in the mild left anterior descending distal circumflex, and origin of second diagonal branch.  (AR 233).  The doctor recommended that plaintiff continue with medical therapy and noted that he was not an ideal candidate for intervention.  (AR 233).  The doctor further noted that plaintiff had a significant history of seizure disorder, but that from a physical point of view, plaintiff was fairly active at home and did yard work.  (AR 234).

Plaintiff appeared for follow-up on February 9, 2004, and was assessed with coronary artery disease and a stable myocardial infarction.  (AR 241).  His medications were adjusted, and plaintiff was ordered to follow up with his primary care provider and to return to the clinic to see the nurse practitioner.  (AR 241).
///

1   On June 9, 2004, plaintiff had an ultrasound which revealed no evidence of

2   deep venous thrombsis bilaterally.  (AR 242).

3   In January 2005, plaintiff was seen for recurrent chest pain though at that

4   point, his chest pain had been resolved.  (AR 160-64).  A January 19, 2005 x-ray

5   revealed that plaintiff had suffered a myocardial infarction.  (AR 167).  The doctor

6   concluded that reversible activity was present in the left ventricle with left

7   ventricular dilatation.  (AR 167).  A January 30, 2005 chest x-ray revealed no

8   acute change since a January 25, 2005 coronary angiogram, that plaintiff's heart

9   size and vaculature were normal, and that plaintiff had no acute disease.  (AR 163,

10  165).  On January 30, 2005, a heart catheterization was performed which revealed

11  that plaintiff had diffuse, minor, or noncritical coronary artery disease.  Optimal

12  medical treatment was recommended.  (AR 160, 163).

13  On April 11, 2005, plaintiff was again seen and denied any chest pain or

14  systems consistent with angina, but indicated he was experiencing some

15  lightheadedness.  (AR 160).  His physical exam was essentially normal.  (AR 160).

16  The doctor's assessment was as follows:  Recent recurrent chest pain of uncertain

17  etiology, status post cardiac catheterization with nonobstructive diffuse coronary

18  artery disease.  Preserved left ventrical function.  History of tobacco use.  History

19  of seizure disorder.  Dyslipidemia.  The doctor recommended adjustments to

20  plaintiff's medications, discontinuation of tobacco use, and follow-up.  (AR 161).

21  On December 3, 2005, plaintiff was seen and reported that he had suffered a

22  seizure at work, had fallen, and had injured his left shoulder.  (AR 177).  He had

23  run out of medication and had no insurance.  (AR 179).  It was the doctor's

24  impression that plaintiff had suffered a seizure, was medication non-compliant,

25  and had a left shoulder injury.  (AR 180).  Plaintiff was discharged with

26  instructions to take his medications as directed.  (AR 180).

27  ///

28  ///

10

Medical progress notes dated January 20, 2006, reflect that plaintiff had a history of seizure disorder, that he had last had a seizure "6 months ago," and that his medications were refilled. (AR 251).

On October 27, 2006, plaintiff sought medical assistance, having reportedly suffered two seizures that day. (AR 210). Plaintiff was assessed as suffering from seizures and was discharged with a prescription for anti-seizure medication and instructions to avoid dangerous situations and to follow-up as instructed. (AR 212).

Chest x-rays taken on December 27, 2006 showed increased interstitial markings, no presence of confluent infiltrates, and unremarkable heart, mediastinum and bony structure. (AR 191).

On February 27, 2007, plaintiff reported that he had suffered a seizure that morning and that he needed a refill of his medications as he had been out for three months. (AR 245).

On April 26, 2007, plaintiff reportedly complained of severe lower back pain and dizziness. (AR 217). A cervical spine x-ray was ordered and medication prescribed, with follow-up ordered in 2-3 weeks. (AR 217). On April 27, 2007, plaintiff reportedly suffered a seizure. (AR 243). He reported that he had not taken his seizure medication for two to three months. (AR 243). He reported having 5-8 seizures per month and having left arm numbness and headaches for the past 6 months. (AR 243). His anti-seizure medication was refilled for one month. (AR 244).

On May 31, 2007, plaintiff returned for a refill of a medication prescription and to obtain the results of the x-ray. (AR 218). The x-ray showed moderate to severe diffuse degenerative change throughout the cervical spine without gross fracture. (AR 249). Plaintiff was referred to orthopaedics and medication. (AR 218). On July 17, 2007, plaintiff returned for another refill of medication. It was the treating nurse practitioner's impression that plaintiff had a seizure disorder and

had suffered unintentional weight loss.  (AR 219).  Blood was taken for lab tests to check his dilantin level and his prescriptions were refilled.  (AR 219).

On August 9, 2007, the nurse practitioner spoke to plaintiff on the telephone.  (AR 219).  Plaintiff complained of dizziness.  (AR 219).  The nurse practitioner directed plaintiff to adjust/decrease his dilantin dosage and to return as soon as possible so that his dilantin level could be rechecked.  (AR 219).  On August 21, 2007, at a follow-up appointment, the nurse practitioner noted that plaintiff had not decreased his dilantin dosage as directed because plaintiff assertedly was afraid of seizure activity.  (AR 222).  It was the nurse practitioner's impression that plaintiff had a seizure disorder and increased cholesterol.  (AR 222).  Plaintiff was referred to neurology and directed to decrease his dilantin dosage.  (AR 222).

Plaintiff was again seen on November 27, 2007 and December 17, 2007.  (AR 224-25).  It was noted that his neurology appointment had to be moved to January 2008 because plaintiff did not have a ride.  (AR 225).

### C.   Consultative Examiner's Report

On December 26, 2006, examining consulting physician Dr. John S. Woodard, performed a neurologic evaluation of plaintiff.  (AR 187-90).  He noted that plaintiff complained of seizures, back problems, neck pain and frequent headaches.  (AR 187, 188).  As to plaintiff's back, plaintiff reported that he had had chronic low back pain for six years with the pain being constant and sometimes radiating downward into both lower extremities.  (AR 187-88).  With respect to plaintiff's motor function, Dr. Woodard reported:

> The usual gait is normal.  Romberg test is negative.  All extremities
> are normal range with respect to muscular power and coordination
> and abnormal movements are absent.  He forebends, tilting the trunk
> forward on the hips by 30 degrees, then complaining of low back pain
> aggravation.  There is slight selective sustained contraction of the

lumbar paraspinal muscles and slight flattening of the normal lumbar lordosis. Straight leg raising is negative with either extremity. There is elicited slight to moderate tightness and tender nodularity of the posterior shoulder muscles bilaterally. Head rotations are not significantly diminished.

(AR 188).

Dr. Woodard diagnosed plaintiff with grand mal epileptic seizures of uncertain etiology, chronic lumbar musculoligamentous strain, and muscle imbalance of left eye. (AR 189). As to plaintiff's prognosis, he opined that plaintiff's neurologic status appeared to be stationary. (AR 189). Dr. Woodard commented:

This individual reports history consistent with grand mal epileptic seizures. There is some inconsistency with respect to frequency of attacks as he states that even with his medication he has five seizures per month but his last seizure occurred almost three months ago. He should not undertake any activities in which the event of a seizure would create a hazard. Due to the very longstanding muscle imbalance of the left eye, he perceives objects only with his right eye and he is therefore incapacitated for activities dependent upon binocular vision. Because of the lumbar strain, his lift and carry capacity is limited to 35 pounds occasionally and 15 pounds frequently. He is capable of bending occasionally. There is no incapacity for squatting, stooping, reaching, grasping, handling, fingering or feeling. There is no incapacity for sitting, standing, or walking.

(AR 189).

///

///

### D.   Non-Examining Physician Reports

On January 23, 2007, consulting non-examining physician Dr. J. Hartman, completed a physical residual functional capacity assessment in which Dr. Hartman opined:   Plaintiff (a) could lift and/or carry 20 pounds occasionally and 10 pounds frequently; (b) stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; (c) sit (with normal breaks) for about 6 hours in an 8-hour workday; (d) was unlimited in his ability to push and/or pull, other than as indicated for lifting and/or carrying; (e) could occasionally climb ramps/stairs/ a ladder/rope/scaffolds, balance, stoop, kneel, crouch, and crawl; (f) had no manipulative limitations; (g) had limited depth perception; (h) had no communicative limitations; and (i) should avoid even moderate exposure to hazards, but otherwise had not environmental limitations.  (AR 193-97).  Dr. Hartman additionally commented that plaintiff had a light residual functional capacity with postural and vision limitations, and seizure precautions (re driving, working at heights or around hazards).  (AR 197).

On March 1, 2007, reviewing non-examining physician Dr. Keith Jay Wahl opined that plaintiff's light residual functional capacity should also include limitations of visual dysfunction for binocular vision.  (AR 199).

## V.   DISCUSSION

### A.   The ALJ Properly Evaluated the Medical Evidence

Plaintiff contends that a reversal or remand is appropriate because the ALJ mischaracterized and inappropriately failed to consider certain items of medical evidence relative to plaintiff's seizure disorder and cervical spine disorder. (Plaintiff's Motion at 2-4).  This Court disagrees.

#### 1.   Seizure Disorder

First, plaintiff alleges that the ALJ inappropriately diminished the severity of, and the functional limitations resulting from plaintiff's seizure disorder because the ALJ improperly inferred that plaintiff was non-complaint with

1    treatment from the fact that plaintiff had at times run out of anti-seizure

2    medication which plaintiff was unable to afford.  (Plaintiff's Motion at 2).  This

3    Court disagrees with plaintiff's characterization of the ALJ's decision.  To the

4    extent plaintiff intends to argue that the ALJ improperly denied benefits based

5    upon plaintiff's failure to follow prescribed treatment when such failure was

6    justified by plaintiff's financial circumstances, plaintiff misreads the ALJ's

7    decision.  The ALJ inferred that plaintiff was not entirely compliant with

8    medication because that is what the progress notes reflected.  The December 2005

9    progress notes cited by the ALJ expressly state:  "Medication Non Compliance,"

10   and direct plaintiff to "take all medications as ordered."  (AR 13) (citing Exhibit

11   2F/10, 12 [AR 180, 182]).  The February 27, 2007 progress notes reflect that

12   plaintiff had suffered a seizure that morning and needed a refill of his medications

13   because he had been out of medication for three months.  (AR 13) (citing Exhibit

14   12F at 20 [AR 245]).  The ALJ was entitled to rely upon such treatment records.

15         Second, plaintiff alleges that the ALJ inappropriately diminished the

16   severity of, and the functional limitations resulting from plaintiff's seizure

17   disorder based upon plaintiff's failure to seek medical care every time he had a

18   seizure even though plaintiff testified that such failure was due to a lack of

19   financial resources and transportation.  (Plaintiff's Motion at 3).  To the extent

20   plaintiff intends to argue that the ALJ improperly discounted plaintiff's statements

21   regarding the frequency of plaintiff's seizures based upon plaintiff's failure to seek

22   regular treatment when such failure was explained by plaintiff's financial

23   circumstances, such contention is addressed in connection with this Court's

24   discussion of the ALJ's analysis of plaintiff's credibility.  In short, the ALJ's

25   decision nowhere suggests that plaintiff's seizures were not as frequent as plaintiff

26   claimed based upon plaintiff's failure to seek regular medical care.  Rather, albeit

27   a somewhat fine distinction, the ALJ pointed to the absence of corroboration in the

28   treatment records for plaintiff's assertions regarding the frequency of the seizures.

1   This lack of objective evidence to support the frequency of the seizures was
2   clearly not the primary reason the ALJ disbelieved petitioner regarding his
3   statements relative to the frequency of his seizures.  The ALJ emphasized, and the
4   record reflects, plaintiff's numerous inconsistent statements, regarding the
5   frequency of such seizures.  For example, the ALJ noted that in December 2005,
6   plaintiff's doctor had the impression that plaintiff was suffering from seizure
7   disorders (AR 180), but approximately one month later, in January 2006, plaintiff
8   reported having last had a seizure six months prior (AR 251).  (AR 13).  The ALJ
9   further noted that although plaintiff reported in November 2006 that he was
10  having a least 12 seizures a month (AR 118), approximately one month later, in
11  December 2006, he told Dr. Woodard both that he had five seizures per month and
12  that he had not had a seizure in three months (AR 189).  (AR 13).

13          Third, plaintiff alleges that the ALJ inappropriately failed to conclude that
14  plaintiff's seizure activity would significantly impact plaintiff's ability to adhere to
15  a normal work schedule.  (Plaintiff's Motion at 2).  This contention again appears
16  to be predicated the assumption that the ALJ improperly discounted plaintiff's
17  statements regarding his seizures.  As discussed below, the ALJ's assessment of
18  plaintiff's credibility is supported by substantial evidence and is free from material
19  error.

20                          **2.   Back Disorder**

21          As to plaintiff's cervical spine disorder, plaintiff alleges that the ALJ
22  (1) ignored plaintiff's testimony and statements that he spent much of his average
23  day laying in a recliner due to his severe back pain; (2) inappropriately relied upon
24  an x-ray to conclude that there was no objective evidence of spinal stenosis or
25  nerve root involvement even though such neurological objective findings could
26  only reliably be obtained through an MRI, which plaintiff could not afford; and
27  (3) failed to recognize that the moderate to severe degenerative changes revealed
28  ///

by the x-ray constituted objective evidence of a cervical spine disorder which could have caused plaintiff's cervical spine symptoms and resulting limitations.

First, to the extent plaintiff contends that the ALJ ignored plaintiff's testimony regarding time spent in a recliner, this Court does not agree.  Although the ALJ did not specifically reference such testimony, it can fairly be inferred from the ALJ's decision that such testimony was considered and rejected.  The ALJ noted that he had considered statements and that such statements were not credible to the extent it was inconsistent with the ALJ's residual functional capacity assessment – which the "recliner" testimony clearly was.  (AR 12).  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").  The ALJ was not required to discuss every piece of evidence in the record.  See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (citations omitted).

Second, to the extent plaintiff argues that the ALJ inappropriately relied upon the x-ray to reveal something only an MRI could show, plaintiff's contention is unsupported by the record.  The Court declines to rely upon plaintiff's counsel's unsupported lay opinion regarding the relative capacity of such technologies to reveal the conditions in issue.

Third, to the extent plaintiff argues that the ALJ drew an incorrect inference from the x-ray, plaintiff again effectively asks this Court to accept his counsel's lay opinion regarding what is and is not an appropriate inference to draw from the medical evidence.  The Court declines to do so.

In light of the foregoing, a remand or reversal based on the ALJ's alleged failure properly to evaluate the medical evidence is not warranted.

### B.    The ALJ Properly Evaluated Plaintiff's Credibility

#### 1.    Pertinent Law

Questions of credibility and resolutions of conflicts in the testimony are functions solely of the Commissioner.  Greger v. Barnhart, 464 F.3d 968, 972 (9th

1  Cir. 2006).  If the ALJ's interpretation of the claimant's testimony is reasonable
2  and is supported by substantial evidence, it is not the court's role to
3  "second-guess" it.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

4      An ALJ is not required to believe every allegation of disabling pain or other
5  non-exertional impairment.  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007)
6  (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  If the record establishes
7  the existence of a medically determinable impairment that could reasonably give
8  rise to symptoms assertedly suffered by a claimant, an ALJ must make a finding as
9  to the credibility of the claimant's statements about the symptoms and their
10  functional effect.  Robbins, 466 F.3d 880 at 883 (citations omitted).  Where the
11  record includes objective medical evidence that the claimant suffers from an
12  impairment that could reasonably produce the symptoms of which the claimant
13  complains, an adverse credibility finding must be based on clear and convincing
14  reasons.  Carmickle v. Commissioner, Social Security Administration, 533 F.3d
15  1155, 1160 (9th Cir. 2008) (citations omitted).  The only time this standard does
16  not apply is when there is affirmative evidence of malingering.  Id.  The ALJ's
17  credibility findings "must be sufficiently specific to allow a reviewing court to
18  conclude the ALJ rejected the claimant's testimony on permissible grounds and
19  did not arbitrarily discredit the claimant's testimony."  Moisa v. Barnhart, 367
20  F.3d 882, 885 (9th Cir. 2004).

21      To find the claimant not credible, an ALJ must rely either on reasons
22  unrelated to the subjective testimony (e.g., reputation for dishonesty), internal
23  contradictions in the testimony, or conflicts between the claimant's testimony and
24  the claimant's conduct (e.g., daily activities, work record, unexplained or
25  inadequately explained failure to seek treatment or to follow prescribed course of
26  treatment).  Orn, 495 F.3d at 636; Robbins, 466 F.3d at 883; Burch, 400 F.3d at
27  680-81; SSR 96-7p.  Although an ALJ may not disregard such claimant's
28  testimony solely because it is not substantiated affirmatively by objective medical

1  evidence, the lack of medical evidence is a factor that the ALJ can consider in his

2  credibility assessment.  <u>Burch</u>, 400 F.3d at 681.

3                  **2.**    **Analysis**

4        Plaintiff contends that the ALJ failed properly to consider plaintiff's

5  subjective complaints and to assess plaintiff's credibility – a material error which

6  resulted in the ALJ concluding that plaintiff could sustain work activity for a

7  sufficient period of time to enable him to hold a job.  (Plaintiff's Motion at 4-8).

8  This Court disagrees.

9        The ALJ discounted plaintiff's credibility assertedly because (1) plaintiff

10  had made inconsistent statements regarding the frequency of his seizures;

11  (2) plaintiff's statements regarding the frequency of his seizures were not

12  corroborated by the progress notes; and (3) plaintiff's statements were

13  contradicted by his activities.  Each of these reasons is supported by substantial

14  evidence and constitutes a clear and convincing basis upon which to discount

15  plaintiff's credibility.

16        First, the ALJ's determination that plaintiff made inconsistent statements

17  regarding the frequency of his seizures is well supported by the record and

18  constitutes a clear and convincing reason to discount plaintiff's credibility.  In

19  December 2005, he sought treatment for a seizure.  (AR 180).  However, in

20  January 2006, he reported that he had not had a seizure in six months.  (AR 251).

21  (AR 13).  In November 2006, he reported that he was having at least 12 seizures a

22  month (AR 118).  In December 2006, he reported that he had five seizures per

23  month, but that he had not had a seizure in three months (AR 189).

24        Second, the ALJ properly determined that plaintiff's reports regarding the

25  frequency of his reported seizures were not supported by the objective evidence.

26  While an ALJ may not disregard a claimant's testimony solely because it is not

27  substantiated affirmatively by objective medical evidence, the lack of medical

28  evidence is a factor that the ALJ can consider in his credibility assessment.  <u>Burch</u>,

1  400 F.3d at 681.  Further, while it may be the case that the lack of supporting
2  objective evidence is at least partly due to plaintiff's financial difficulties which
3  inhibited him from seeking medical care, this does not alter the fact that such
4  objective evidence is lacking or mean that it is inappropriate for the ALJ to
5  consider the absence of corroborating objective medical evidence in assessing
6  plaintiff's credibility.  This is distinct from the situation involved in cases in which
7  an ALJ has discounted a claimant's statements because the ALJ has inferred that a
8  claimant's failure to seek treatment is indicative of the absence of the need for
9  treatment and such failure may instead be explained by the claimant's financial
10  circumstances.

11  Third, the ALJ properly discredited plaintiff's allegations of disabling pain
12  as inconsistent with plaintiff's daily activities.  See Thomas v. Barnhart, 278 F.3d
13  947, 958-59 (9th Cir. 2002) (inconsistency between the claimant's testimony and
14  the claimant's conduct supported rejection of the claimant's credibility); Verduzco
15  v. Apfel,188 F.3d 1087, 1090 (9th Cir. 1999) (inconsistencies between claimant's
16  testimony and actions cited as a clear and convincing reason for rejecting the
17  claimant's testimony).  The ALJ reasonably concluded that a person who was
18  unable to work would not have been able to sustain the daily schedule maintained
19  by plaintiff (able to prepare his own meals, wash dishes, take care of a dog, pick
20  up dog waste, shop in stores for food, attend medical appointments without
21  assistance, walk a mile), as self-reported by plaintiff.  (AR 95, 96, 98, 99).
22  Although plaintiff suggests that the ALJ has misrepresented the facts and took
23  plaintiff's statements out of context, this Court disagrees.  While the ALJ did not
24  reference some of plaintiff's other inconsistent statements regarding his activities
25  and abilities, resolution of such conflicts was within the ALJ's purview.
26  This Court will not second-guess the ALJ's reasonable interpretation of such
27  ///
28  ///

20

evidence, even if such evidence could give rise to inferences more favorable to plaintiff.[5]

As the ALJ made specific findings stating clear and convincing reasons supported by substantial evidence for discrediting plaintiff's allegations regarding his symptoms and limitations, the ALJ's credibility determination does not warrant a reversal or remand.[6]

## VI. CONCLUSION

For the foregoing reasons, the decision of the Commissioner of Social Security is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: September 13, 2010

_____
/s/

Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE

---

[5]Plaintiff also suggests that the ALJ's credibility assessment of plaintiff is flawed because the ALJ did not adequately address statements of plaintiff's girlfriend/roommate which corroborated plaintiff's statements. (Plaintiff's Motion at 5, 7). This Court disagrees. Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. Stout, 454 F.3d at 1056 (citations omitted); Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). Here, the ALJ satisfied his obligations in this regard. (AR 11-12). To the extent the ALJ erroneously failed to discuss plaintiff's girlfriend's statements, any error was harmless as the ALJ expressly noted in his decision that he had considered such lay evidence and because such evidence was cumulative of plaintiff's own statements. See Zerba v. Commissioner of Social Security Administration, 279 Fed. Appx. 438, 440 (9th Cir. 2008) (failure to address husband's cumulative lay testimony harmless error); Rohrer v. Astrue, 279 Fed. Appx. 437, 437 (9th Cir. 2008) (rejecting claimant's contention that ALJ improperly rejected lay witness statement of claimant's girlfriend where such statement cumulative of statements by claimant which ALJ accepted). (The Court may cite unpublished Ninth Circuit opinions issued on or after January 1, 2007. See U.S. Ct. App. 9th Cir. Rule 36-3(b); Fed. R. App. P. 32.1(a)).

[6]Even if one of the bases upon which the ALJ discredited plaintiff's testimony was deficient, any such error was harmless because the remaining reasons identified by the ALJ are supported by substantial evidence and any such error would not negate the validity of the ALJ's ultimate credibility conclusion in this case. See Carmickle, 533 F.3d at 1162 (Where some reasons supporting an ALJ's credibility analysis are found invalid, the error is harmless if (1) the remaining reasons provide substantial evidence to support the ALJ's credibility conclusions, and (2) "the error does not negate the validity of the ALJ's ultimate credibility conclusion.") (quoting Batson, 359 F.3d at 1195) (citation and internal quotation marks omitted).